UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LAMONT HOWARD,                           Case No. 3:16-cv-00665-HDM-CLB

                         Petitioner,

        v.                                        ORDER

HAROLD WICKHAM, et al.,

                         Respondents.

        This counseled habeas petition pursuant to 28 U.S.C. § 2254 comes before the court for consideration of the merits of the amended petition (ECF No. 21). Respondents have answered (ECF No. 50), and petitioner Lamont Howard ("Howard") has replied (ECF No. 58).

        In addition, Howard has moved for an evidentiary hearing. (ECF No. 60). Respondents have opposed (ECF No. 61), and Howard has replied (ECF No. 62).

**I. Background**

        Howard challenges his 2011 state court judgment of conviction, pursuant to jury trial, of sexual assault, two counts of first-degree kidnapping, attempted sexual assault, and two

counts of battery with intent to commit sexual assault. (Ex. 46).[1] The charges arose from two incidents that took place on July 31, 2010. (Ex. 4). Howard was accused of first kidnapping and sexually assaulting Marilyn S. and then kidnapping and attempting to sexually assault Michele C. (*Id.*) A third woman, Heather, alleged that Howard had also followed her around Virginia Lake for upwards of an hour that same day. Howard was not charged with any crimes in connection with Heather.

On June 6, 2011, trial commenced. (*See* Ex. 132). The first victim, Marilyn, testified that Howard approached her in the parking lot of the Ponderosa Hotel on her way to the Discount Liquor Store, at around 8 a.m. on July 31, 2010. (*Id.* at 214, 222-23). Howard, who was with another man, asked Marilyn to go with him; Marilyn said no and hurried over to the store. (*Id.* at 222-25, 228-229). As Marilyn stood outside the liquor store, trying to see if the owner, who had previously banned her, was inside, Howard pulled into the parking lot and parked in front of the store. (*Id.* at 230-31). The man that had been with him got out of the car and left. (*Id.* at 232-33; 239).

Howard got out and pushed Marilyn toward his car. (*Id.* at 233-35). She told him to leave her alone and go away, but Howard continued to push. (*Id.* at 235-36). Once he had Marilyn in the car, Howard shut the door, ran to the driver's side, and drove back to the Ponderosa parking lot. (*Id.* at 241, 244).

---

[1] The exhibits cited in this order, comprising the relevant state court record, are located at ECF Nos. 30-33 & 51. Petitioner also filed exhibits, located at ECF Nos. 16 and 59, which the court does not cite in this order.

While in the parking lot, Howard pulled his pants down and crawled on top of Marilyn, as Marilyn struggled and tried to push him away. (*Id.* at 244-45, 248-49). Howard told Marilyn that he was going to penetrate her, to call him "daddy," and that he wasn't going to share her with anyone. (*Id.* at 251-52). He unzipped her pants, began rubbing her vagina, and told her to grab his penis. (*Id.* at 252-53). Although Marilyn complied, she did so by squeezing hard, but the effort, intended to get Howard off of her, did not work. (*Id.* at 252-54). Eventually, however, Howard did get off. (*Id.* at 253-55). Marilyn attempted again to get out of the car, but Howard pulled her back in by her leg, clothing, and hair. (*Id.* at 245-46; 254). He then drove off. (*Id.* at 255).

As they drove, Marilyn asked Howard to take her to a nearby gas station, where she knew other people would be and where she planned to call 911. (*Id.* at 233). On the way there, Howard continued to pull her hair and her clothes. (*Id.* at 256). Once there, Howard parked in the back of the station, where he again pulled on Marilyn's hair and forced her head down toward his lap, this time sticking his penis in her mouth. (*Id.* at 257, 260-61).

Marilyn continued to fight and was eventually able to get out of the car and into the gas station, where she called the police from the store's phone. (*Id.* at 261-62; Ex. 133 (Tr. 20)). Howard drove to the front of the store, got out of the car, and opened the door to the store. (Ex. 133 (Tr. 23)). He did not come inside but instead stood in the doorway. (*Id.* at 23). After standing there for a few seconds, he left. (*Id.* at 24).

According to the gas station clerk, Rajeev Verma, Marilyn appeared scared and said she needed help and that someone was

trying to rape her. (Ex. 133 (Tr. 77-80)). When Howard was in the doorway, he was trying to talk to Marilyn, apparently asking her to come outside, but Marilyn did not appear to want to go with him. (*Id.* at 80-83). Verma described Howard as yelling and unkind, describing him as "kind of rude and kind of like he was mad on her or something." (*Id.* at 97).

The officer who responded to Marilyn's 911 call described her as calm when he was talking to her. (Ex. 134 (Tr. 80)). Another officer said that during his interview with Marilyn, it seemed like the timeline of events was much longer than the details she was giving. (*Id.* at 144-45). And the man who was with Howard in the Ponderosa parking lot when Howard and Marilyn first met testified that he observed Howard and a woman fitting Marilyn's description engaged in playful, almost flirting, conversation for a long time. (Ex. 135 (Tr. 129-33)). That man thought there was reciprocal interest based on the way Howard and the woman were talking. (*Id.* at 148-50).

The second victim, Michele, testified that she was walking home from her friend's house in the area of Kuenzli Lane in Reno on July 31, 2010, at around 10 a.m. when Howard pulled up into a driveway, blocking her path, and told her he wanted to give her the time of her life. (Ex. 133 (Tr. 104-08, 111)). Michele responded, "no thank you, I'm not interested in that, but you can give me a ride if that's what you want to do." (*Id.* at 111-12). Howard replied, "Okay get in." (Ex. 134 (Tr. 24)).

Michele pointed Howard in the direction she wanted to go, but he went the opposite way. (Ex. 133 (Tr. 112)). His words became sexually aggressive. (*Id.*) Michele told Howard he was going the

wrong way, to which Howard responded that he was going to give her the time of her life before he would let go. (*Id.* at 113). As Michele began looking for a way out of the car, Howard reached over and began to play with her hair. (*Id.* at 114). Michele told Howard to stop the car and instead he sped up. (*Id.*) Howard reached over and pulled the scrunchie out of Michele's hair; Michele got angry and grabbed it back. (*Id.* at 115-16). Howard became more physical and forceful, reaching over, twisting Michele's hair, and pulling her head down inches away from his groin. (*Id.* at 116). Michele was able to push herself back up. (*Id.* at 118).

All the time, Howard continued to drive. (*Id.* at 117). Howard did not stop at any stop signs, and there were no red lights. (*Id.* at 119-20). As they approached a stop sign and Howard slowed – but didn't stop -- Michele opened the door and jumped out. (*Id.* at 119-2). Howard grabbed Michele's hair and sped up, but Michele was already halfway out, and after being dragged some distance with her legs out the door, she eventually fell out of the car, landing on her chin. (*Id.* at 121-22, 125-26). Badly injured, Michele approached a cab driver and asked him to take her to her hotel; the driver refused, telling Michele to call 911. (*Id.* at 126, 129). Michele then went to a nearby minimart and asked them to call 911; the clerk refused and told Michele to leave. (*Id.* at 129). Sachin Verma, who was in the store at the time, offered to call 911 on his cell for Michele. (*Id.* at 131; (Ex. 134 (Tr. 34-35)). Sachin Verma described Michele's demeanor as frantic, scared and crying. (Ex. 134 (Tr. 34-35)).

Heather[2] also testified. She told the jury that on the morning of July 31, 2010, she was visibly pregnant and walking her two-year-old daughter around Virginia Lake when Howard pulled up next to her in his car and asked her to come talk with him. When she refused, explaining she was pregnant, with her daughter, and had a boyfriend at home, he continued to drive alongside her for at least five or ten minutes more. (Ex. 135 (Tr. 96-105)). Eventually, Heather got to the park and Howard drove away. (*Id.* at 106-09).

After letting her daughter play for 30-45 minutes, Heather began to walk back the way she had come. When she reached the parking lot, however, Howard was there, and as she passed near him he again started talking to her. (*Id.* at 109-10). Heather told Howard he was scaring her, and Howard replied, "I don't want to scare you," and drove off. (*Id.* at 110). But again Heather ran into Howard, this time near the bathrooms. When she again told him he was scaring her, he left in his car momentarily but returned, pulling up next to her and saying, "Well if you were a real bitch, you would sit and at least talk with me." (*Id.* at 111-13, 115). Heather put her head down and continued to walk; Howard continued to follow her. (*Id.* at 114). All told, Howard followed Heather for about an hour. Howard left only after Heather encountered a couple that was willing to help her. (*Id.* at 116-17).

---

[2] Before the trial began, the court had ruled Heather's testimony was not admissible but warned the door to it could be opened. Following statements by defense counsel in opening and in questioning Detective Doser, the trial court ruled the door had been opened and Heather could testify.

Marilyn, Michele and Rajeev Verma all identified Howard as the man in question during trial. (Ex. 132 at 222; Exhibit 133 at 81; Exhibit 133 at 106). In addition, other evidence connected Howard to the crimes. The license plate number of the vehicle used in Marilyn's assault matched a vehicle belonging to Howard's daughter, and Howard could not be excluded as the source of DNA collected from Marilyn's mouth. (Ex. 134 (Tr. 60, 68-69); Ex. 135 (Tr. 84-85)). When interviewed by Detective Doser, Howard lied about where he had been the morning of July 31, 2010, and denied engaging in any sexual contact that day. (Ex. 134 (Tr. 116-19, 147)).

The jury found Howard guilty on all counts. (Ex. 46). Howard moved to set aside the verdict or, in the alternative, for a new trial; the motion was denied. (Exs. 49 & 137 at 3-4). Howard was sentenced and judgment of conviction entered. (Exs. 56 & 137).

On appeal, the Nevada Supreme Court affirmed. (Exs. 61, 72 & 80). Howard thereafter pursued a state postconviction petition, which the trial court denied. (Exs. 83, 89 & 99). The Nevada Supreme Court affirmed. (Ex. 111).

Howard now pursues his claims via the instant federal habeas petition pursuant to 28 U.S.C. § 2254. The claims therein are before this court for review on the merits.

**II. Standard**

28 U.S.C. § 2254(d) provides the legal standards for this Court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the     State     court proceeding.

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted.)

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and

8

nevertheless arrives at a result different from [the Supreme Court's] precedent." *Andrade*, 538 U.S. 63 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181. The state courts' decisions on the merits are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, - U.S. -, 135 S. Ct. 2187, 2208 (2015).

**III. Analysis**

**A. Ground One**

In Ground One, Howard asserts that his "trial attorney provided ineffective assistance of counsel by opening the door to" Heather's testimony. (ECF No. 21 at 13).

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief— deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met

the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Strickland*, 466 U.S. at 696.

The State moved to admit Heather's testimony prior to trial. (Ex. 7). At a hearing, the trial court ruled Heather's testimony was inadmissible to prove a common plan or scheme but warned that the door could be opened depending on the questions defendant asked or evidence he introduced during trial. (Ex. 126). Howard's attorneys for trial -- Marc Picker and Angela Lightner – did not assume representation of Howard until after this hearing. (*See id.*; Ex. 26).

In opening statements during trial, Lightner argued that Howard believed the women were open to having fun with him and that prostitution commonly occurs in the area where the crimes allegedly took place. (Ex. 132 (Tr. 207)). Then, while questioning Detective Doser, Picker asked the following:

> Q: Okay. Because you said to Mr. Howard, "Oh, it happens all the time. Guys pick up girls on Virginia Street all the time." Is that a true statement?
>
> A. We certainly look at alternative hypotheses, yes.
>
> . . . .
>
> Q. How about the statement, "Sometimes it's a misunderstanding, a business deal gone awry. And you're gonna sit here and tell me there aren't prostitutes in the city, man, 'cuz there is." That part's true, right? You know there's prostitutes in the city and on South Virginia Street, right?
>
> A. Yes.
>
> . . . .
>
> Q. Is picking up a prostitute in Washoe County a crime, or in the city of Reno? . . .
>
> A. Yes. It's against the law.

> Q. Okay. So if you were accusing somebody of picking up
> a prostitute, they might deny it?

(Ex. 134 (Tr. 150, 152, 156-57)). The prosecutor objected to the last statement, and the objection was sustained.

In response to these questions, the State moved to introduce Heather's testimony. It argued that Howard had opened the door by "bringing up the defense that he believed that these women were prostitutes and that his only mistake was committing a crime of picking up a prostitute versus picking up these women and assaulting them." (Ex. 134 (Tr. 182)). The State argued that the fact Heather was "pregnant and pushing her baby around the lake is indicative that she's not a prostitute." (*Id.* at 183). Although defense counsel argued that he was merely repeating Doser's own words, the trial court ultimately ruled Heather's testimony admissible as to defendant's intent, in part because the defense had suggested in opening that Howard believed the women were prostitutes. (*Id.;* Ex. 135 (Tr. 55-56)).

Defense counsel immediately moved for a mistrial on the basis of ineffective assistance of counsel. When the court noted it seemed that counsel had strategic reasons for its questions, counsel objected, stating:

> It was a misreading on our part. Since we didn't do the hearing [at which the court warned defense might open the door to Heather's testimony], we didn't properly understand the basis and where you're coming from, so quite frankly, we've screwed this trial up and I don't think there's a way around it.

(*Id.* at 56). The court denied the motion. (*Id.* at 56-57). But before Heather testified, it issued a limiting instruction, advising the jury that it was

about to hear evidence that the defendant committed other acts not charged here. You may consider this evidence only for its bearing, if any, on the question of the defendant's intent or absence of mistake and for no other purpose. You may not consider this evidence as evidence of guilt of the crimes for which the defendant is now on trial.

(Ex. 135 (Tr. 96)).

The Nevada Supreme Court addressed Howard's claim that counsel was ineffective for opening the door to Heather's testimony as follows:

We conclude that the district court did not err in denying this claim without an evidentiary hearing. On direct appeal, this court concluded that, even if the prior bad act evidence was erroneously admitted at trial, the admission was harmless in light of the other evidence. . . Thus, the district court properly found that Howard could not demonstrate a reasonable probability of a different outcome at trial but for trial counsel's opening the door to this evidence. Because Howard's claim of ineffective assistance failed on the prejudice prong, he was not entitled to an evidentiary hearing. . . .

(Ex. 111 at 1-2). On direct appeal, the Nevada Supreme Court had held that the admission of Heather's testimony, even if improper, "would amount to harmless error, since both Marilyn and Michele provided sufficient credible evidence to support Howard's convictions." (Ex. 80 at 11). The court also noted, in another context, that the evidence supporting Howard's conviction was "overwhelming." (*Id.* at 13).

Howard first argues that the Nevada Supreme Court's finding of no prejudice should not be entitled to deference because it applied the incorrect standard. Specifically, although the court purported to find no reasonable probability of a different outcome absent Heather's testimony, it did so on the basis of its direct appeal finding that introduction of Heather's testimony, if error,

was harmless, because Marilyn and Michele provided "sufficient credible evidence to support Howard's conviction." Thus, Howard argues, Nevada Supreme Court's holding of no prejudice was predicated on a "sufficiency of the evidence" standard, a standard much lower and easier for the State to meet than the applicable *Strickland* standard. Therefore, Howard argues, the state courts applied the wrong legal standard and their determination is not entitled to deference.

The court is not persuaded. There is no indication that the Nevada Supreme Court's use of the words "sufficient evidence" meant that it was applying a sufficiency of the evidence standard to determine whether there was harmless error -- particularly where, just above, it had cited *Tavares v. State* for the harmless error standard. *Tavares* dictates that an error is harmless unless it had a "substantial and injurious effect on the jury's verdict." (*See* Ex. 80 at 9 (citing *Tavares v. State*, 30 P.3d 1128, 1132 (Nev. 2001)). And there is no indication that by referring back to this finding, while expressly citing the applicable *Strickland* standard, that the Nevada Supreme Court was applying a sufficiency of the evidence standard. The court therefore finds that the state courts applied the appropriate standard to the prejudice determination and that the state court finding is therefore entitled to deference.

Turning to the question of whether the state courts were objectively reasonable in finding no prejudice from Heather's testimony, Howard argues that Marilyn and Michele's testimonies were so weak that there is a reasonable probability the jury would not have convicted in the absence of Heather's credible and very

inflammatory testimony. Respondents argue that Heather's testimony was relatively innocuous compared to the far more violent and inflammatory accounts of Marilyn and Michele.

Heather's testimony undoubtedly cast Howard in a negative light. She testified that Howard persistently pestered her, a visibly pregnant woman with her toddler child, for more than an hour.[3] Nevertheless, Marilyn and Michele's testimonies both detailed physical sexual violence over prolonged periods of time, by way of forced abduction and in the face of clear protest by both women. It would have been reasonable for the state courts to conclude that, as such, the testimony of the victims was far more inflammatory than Heather's testimony.

Further, the testimonies of the victims were not as weak as Howard suggests.

With respect to Michele's testimony, Howard focuses on the fact that it began with Michele making a questionable decision – to get into the car with Howard after he had propositioned her for sex. While a decision that many would not have made, it does not render Michele's account of Howard's actions unbelievable. Howard can point to little else inconsistent or unbelievable about Michele's account, other than the fact that when Howard forced her head to his groin she could not remember if his penis was exposed.

---

[3] As an example of the inflammatory nature of Heather's testimony, Howard highlights an instance in which Heather appeared to break down during her testimony. (*See* Ex. 135 at 106-07). Respondents argue that, in context, Heather's breakdown is more likely attributable to a court admonishment than to her own testimony. The court would agree – or at the least it would not have been unreasonable for the state courts to interpret the exchange in this way.

15

It is not reasonably likely that Michele's failure to remember this detail would have caused a jury to doubt her testimony.

Most of Howard's attack on Marilyn's testimony is also without merit. While it is true that Marilyn omitted details from her various accounts, that does not necessarily indicate she was lying. Omitting details is altogether different from providing inconsistent details, and Marilyn's testimony included the former, not the latter. Additionally, Marilyn testified that she had mental health issues and problems communicating; it is reasonable to expect that someone with these limitations who just underwent a traumatic event might not remember to share every detail each time she tells the story.

In addition, Howard asserts Marilyn's version of events could not have been believed because her actions did not make sense. In particular, Howard makes much of the fact that Marilyn was going to a liquor store at 8 a.m. despite professing to not drinking alcohol, not intending to purchase alcohol, and to being blacklisted at the store. He also makes much of her choice to call 911 from a gas station instead of the cell phone in her pocket. Both of these decisions, however, were reasonable as a matter of common sense and based on testimony at trial.

Marilyn testified that she was planning to enter the liquor store only if the man who had expelled her was not there. While she could not state what she was planning to buy, other evidence at trial – including from defendant's own witness[4] – suggested that the liquor store carried items other than alcohol. And there is no indication that there were other businesses nearby from which

_____

[4] Ex. 135 (Tr. 129-33)).

Marilyn could have obtained whatever it was she was after. Marilyn's decision to call 911 from a gas station also made sense. Rather than attempting a call from within the car, in a position in which Howard could have stopped the call or hurt her even more, she chose to be brought to a place of safety, around other people, before calling 911. This was a reasonable choice on her part.

Howard also asserts that it is improbable that Howard abducted Marilyn or that Marilyn failed to call for help. Howard notes that the abduction supposedly occurred on Virginia Street, which he describes as a major thoroughfare near downtown Reno where "presumably" people would be walking. However, Howard provides no evidence to support his presumption that, at 8 a.m. on a Saturday morning, there would have been such a number of people walking on that particular stretch of Virginia Street that either an abduction could not have occurred or a call for help would have been heard. Nor was any such evidence presented at trial.

Finally, the fact Howard did not ejaculate while assaulting Marilyn is not a fact of any significance. There are a plethora of reasons Howard might have stopped before ejaculating that are consistent with him assaulting Marilyn against her will.

Howard raises a number of additional points about Marilyn's testimony and argues that Heather's testimony unduly corroborated Marilyn's questionable account. However, even considering these additional points, there is no reasonable probability that the outcome of the proceedings would have been different had Heather not testified.

First, the trial court issued a proper limiting instruction, which restrained the impact of Heather's testimony to the issue of

Howard's intent and absence of mistake. In light of the limiting instruction, there is not a reasonable probability of a different outcome had Heather not testified.

Second, Howard does not challenge the joinder of Marilyn's and Michele's charges. Because the cases were tried together, the evidence that was adduced included both Michele's testimony and Marilyn's testimony. Michele presented an account that was in many ways similar to Marilyn's account, and the women had no connection to each other or apparent motivation to be untruthful. This, considered with Howard's denial of being with either woman and all the other evidence that did not include Heather's testimony, was overwhelming evidence of Howard's guilt. It was not objectively unreasonable for the state courts to conclude that the outcome of the proceedings would not have been different had Heather not testified.

Howard is not entitled to relief on Ground One of the petition.

**B. Ground Two**

In Ground Two of the petition, Howard asserts that the trial court violated his rights to due process and a fair trial by admitting Heather's testimony. (ECF No. 21 at 21).

"[I]t is not the province of the federal habeas court to reexamine state court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Therefore, as a general rule, federal courts may not review a trial court's evidentiary rulings. *Crane v. Kentucky*, 476 U.S. 683, 689

(1986). A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process. *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (The federal court's "role is limited to determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process."). Habeas relief is thus available only if an evidentiary ruling or rule was arbitrary, disproportionate to the end it was asserted to promote, or so prejudicial that it rendered the trial fundamentally unfair. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.1995).

Petitioner is entitled to habeas relief only if the error has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627, 637 (1993).

As previously discussed, the Nevada Supreme Court addressed this claim by holding that admission of Heather's testimony, even if improper, "would amount to harmless error, since both Marilyn and Michele provided sufficient credible evidence to support Howard's convictions." (Ex. 80 at 11). For the same reasons as discussed in Ground One, Howard is not entitled to relief on this ground of the petition. The Nevada Supreme Court was not objectively unreasonable in finding any error, it if was error, to be harmless given the strength of the evidence against Howard. Howard is not therefore entitled to relief on Ground Two.

## C. Ground Three

In Ground Three, Howard asserts that several of the prosecutor's statements amounted to misconduct and that the statements, individually and cumulatively, violated his rights to due process and a fair trial. (ECF No. 21 at 21).

A defendant's constitutional right to due process of law is violated if the prosecutor's misconduct renders a trial "fundamentally unfair"; thus, a prosecutor's improper comments amount to a constitutional violation if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986). However, even if there was a constitutional violation, a petitioner is entitled to relief only if he was actually prejudiced by the comments. *Id.* (citing *Ayala*, 135 S. Ct. at 2197, and *Brecht*, 507 U.S. at 627, 637). Comments cause actual prejudice if they had a "substantial and injurious effect or influence on the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala*, 135 S. Ct. at 2197-98.

Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal quotation marks omitted). The Supreme Court has looked at the following factors: (1) whether the prosecutor's comments

20

manipulated or misstated the evidence; (2) whether the trial court

gave a curative instruction; (3) the weight of the evidence against

the accused. *Darden*, 477 U.S. at 181-82.

Howard first asserts that the prosecutor improperly referred

to his defense theory as a "lie." This statement occurred when

the prosecutor was discussing what Howard intended with respect to

Marilyn and Michele. She stated:

> That's what you have to consider with regard to intent.
> That is the reason that Heather B. was here to testify,
> because if it was the intent of him to just pick up some
> girls and have a good time and possibly these were
> prostitutes, that's a lie by the fact he approached her
> at Virginia Lake.

(Ex. 136 at 195). The Nevada Supreme Court addressed Howard's claim

as follows:

> Howard argues that the prosecutor engaged in misconduct
> by making numerous prejudicial comments during the
> State's closing argument. . . . Some of the alleged
> prosecutorial misconduct that Howard challenges on
> appeal was not objected to at trial. . . .
>
> The unobjected-to comments that Howard now asserts
> amounted to prosecutorial misconduct occurred when the
> prosecutor: (1) characterized the defense as a lie. . .
> .
>
> Generally, failure to object precludes appellate review
> unless the error is plain error. *Valdez v. State*, 124
> Nev. 1172, 1190, 196 P.3d 465, 477 (2008). Under plain
> error review, reversal is not warranted unless "the
> defendant demonstrates that the error affected his or
> her substantial rights, by causing actual prejudice or
> a miscarriage of justice. Id. (internal quotations
> omitted). Howard has failed to demonstrate how the
> unobjected-to comments substantially prejudiced him or
> caused a miscarriage of justice. Since these particular
> comments do not constitute plain error, reversal is not
> warranted.

(Ex. 80 at 11-12 & n.5).

Respondents argue that (1) the prosecutor's comment can be

read as intending to state that Howard's position was "belied" by

the fact he approached Heather, and (2) even if the passing reference was improper, it did not so fatally infect the trial with unfairness to be a violation of due process.

While the prosecutor may have *intended* to use the word "belied," the word she actually used was "lie." The prosecutor therefore called Howard's defense a lie. However, even assuming such a statement amounted to misconduct, the error would be subject to harmless error analysis, *Crane*, 476 U.S. at 691, meaning that Howard would be entitled to habeas relief only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 627, 637 (1993)). The evidence against Howard was extremely strong, so strong that the court cannot find the state courts were objectively unreasonable in concluding that this isolated remark by the prosecutor did not impact the jury's verdict in any substantial way.  Howard is not therefore entitled to relief on sub-part one of Ground Three.

Second, Howard asserts that the State improperly vouched for Marilyn by saying she "didn't like to tell her story" and that she "can't remember a lot of what" Howard said to her while she was in the gas station. (ECF No. 21 at 22). The district court upheld the objection to the second statement and instructed the prosecutor to rephrase, which she did. The Nevada Supreme Court addressed this claim as follows:

> Errors properly preserved for appellate review are reviewed for harmless error. Id. Valdez states:
>
> > The proper standard of harmless-error review depends on whether the prosecutorial misconduct is of a constitutional dimension. If the error is of constitutional dimension,

> then we . . . will reverse unless the State
> demonstrates, beyond a reasonable doubt, that
> the error did not contribute to the verdict.
> If the error is not of constitutional
> dimension, we will reverse only if the error
> substantially affects the jury's verdict.

Id. at 1188-89, 196 P.3d at 476 (footnotes omitted).

Howard first asserts that the prosecutor improperly commented that Marilyn did not like being a witness and telling her story. We conclude that this statement was a fair comment on the evidence because the prosecutor was pointing out Marilyn's demeanor as a witness, rather than asserting a personal belief. A prosecutor is allowed to express opinions and beliefs during closing argument so long as the statements made are fair comments on the evidence presented to the jury. Domingues v. State, 112 Nev. 683, 696,917 P.2d 1364, 1373 (1996).

Howard next asserts that the prosecutor improperly vouched for Marilyn's testimony when she made the following statement:

> Now, the idea that Marilyn said, Well, he
> just stood there in the doorway, and Mr. Verma
> said, Well he was sort of beckoning her and
> saying rude things, Marilyn can't remember a
> lot of what he said. I—I asked her –

"Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." Lisle v. State, 113 Nev. 540, 553, 937 P.2d 473, 481 (1997) (internal quotations omitted). It is unclear from Howard's argument what part of the prosecutor's comment he believes amounted to vouching. Assuming he meant to concentrate on the phrase "Marilyn can't remember a lot of what he said," this is also a fair comment on the evidence and not tantamount to vouching. Further, even if it were somehow vouching, in light of the overwhelming evidence supporting Howard's conviction, we conclude that this statement did not "substantially affect[] the jury's verdict." See Valdez, 124 Nev. at 1189, 196 P.3d at 476.

(Ex. 80 at 12-13).

The state courts were not objectively unreasonable in concluding that the prosecutor's statements did not amount to vouching and that, even if they were vouching, they were harmless. It is clear from Marilyn's testimony that she had difficulty

remembering things. And it is a fair reading of the testimony that she did not like to tell her story. The state courts were not therefore objectively unreasonable in concluding that the prosecutor's comments were a fair comment on the evidence. Moreover, the evidence against Howard was very strong, and it is unlikely that these comments had a substantial and injurious effect on the jury's verdict. Howard is not therefore entitled to relief on sub-part two of Ground Three.

Third, Howard asserts the prosecutor relied on facts not in evidence when she made statements about the effect of Marilyn's medications and when she said Marilyn was the type of person one would pick to victimize. (Ex. 136 (Tr. 127-29)). The prosecutor stated:

> And you heard that the medication she's on is twofold. I think it was Abilify and Celexa. I can't remember off the top of my head. But she did tell you that what it does is it levels her out and keeps her level.
>
> So if she has a flat affect and she doesn't sound like she's hysterical on the 911 call, you can hear her go up and down in her voice because she's getting frustrated, but she's on medication and it keeps her at that level, and it does it because there's a reason for that.
>
> . . . .
>
> She is who you would pick out if you were going down the street and looking for someone to victimize, the kind of person you would pick out, because of her size, her demeanor, and her inability to sort of be effective in communicating with people. And what are the chances of someone like that coming to court and actually testifying, which she did in this case.
>
> So if you're on the street and you're looking for a victim, that's sort of someone who you want to find; someone who you know you can victimize easily.

(Ex. 136 (Tr. 128-29)).

The Nevada Supreme Court found no prejudice or miscarriage of justice on the basis of the prosecutor's statements. (Ex. 80 at 11-12 & n.5). Respondents assert that the Nevada Supreme Court's conclusion was objectively reasonable because the prosecutor's statements were a fair comment on the evidence.

The state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Initially, the court would point out that Marilyn testified she is bipolar, suffering from anxiety, depression, and panic attacks, and was on two medications to calm her down. (Ex. 132 (Tr. 211-13)). She also testified that, as a result of her mental condition, she has difficulty communicating with people, explaining and understanding things, and that she often gets frustrated. (*Id.* at 213). In light of this testimony, at least as to the first objection, the prosecutor's statement was based on facts in evidence and was not improper. The second objected-to statement encompassed both things Marilyn testified to and facts that the jury could observe. The prosecutor's statements on those facts were also fair commentary on the evidence.

Further, regardless of the propriety of either statement, it was not unreasonable for the state courts to conclude they did not prejudice Howard. As previously noted, the evidence against Howard was extremely strong. It is unlikely that the prosecutor's statements in this regard had any real effect on the jury's verdict. Howard is not entitled to relief on sub-part three of Ground Three.

Fourth, Howard asserts the prosecutor inappropriately personalized the case several times, including when she stated:

(1) "I take issue with a couple of things that were represented," (Ex. 136 (Tr. 186)); (2) "I don't need to prove a sexual assault with Marilyn at the Ponderosa.  The sexual assault I need to prove is the fellatio that occurred at the XXX parking lot," (*id.* at 189), and (3) "my sexual assault charge," (*id.* at 190). After the last comment, the prosecutor was admonished to restate, and she corrected her statement to the "the State's charges."

The Nevada Supreme Court found no prejudice or miscarriage of justice on the basis of the prosecutor's statements. (Ex. 80 at 11-12 & n.5). The state courts' conclusion was not contrary to, or an unreasonable application of clearly established federal law or an unreasonable determination of the facts.  Given the strength of the evidence against Howard, it was not objectively unreasonable for the state courts to conclude that the prosecutor's statements did not have a substantial and injurious effect on the jury's verdict. Howard is not entitled to relief on this part of the Ground Three.

Fifth, Howard argues that the prosecutor tried to inflame the jury's passions by telling them to put themselves in Michele's shoes.  Howard cites to the following statement:

> No, as he's doing this, the situation is escalating, and she's not sure what to make of this: Is this guy serious? Because you don't really expect when you're leaving your friend's house on a regular day, walking down the street on a beautiful July day, that some guy's really going to pick you up and then try to assault you. You're thinking: What's going on here?  And your red flags are going off, but you're not sure how to take it, and then you're not sure what you're going to do about it.

(Ex. 136 (Tr. 135-36)). The Nevada Supreme Court found no prejudice or miscarriage of justice on the basis of the prosecutor's statements. (Ex. 80 at 11-12 & n.5).

The state court's conclusion was not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts. Given the strength of the evidence against Howard, it was not objectively unreasonable to conclude that Howard suffered no prejudice from the comments. Howard is not entitled to relief on sub-part five of Ground Three.

Sixth, Howard asserts that the prosecutor made a series of additional improper statements to which defense counsel objected. Howard merely cites a four-page span, however, without identifying which of several objected-to statements violated his rights, or how. The court agrees with respondents that to this extent Ground Three is insufficiently pled and relief cannot be granted on such conclusory claims. Howard is not entitled to relief on sub-part six of Ground Three.

Finally, Howard argues that the prosecutor's statements, cumulatively, rose to the level of a due process violation. The court has considered the cumulative effect of the prosecutor's statements and concludes that, in light of the strong evidence against Howard, whatever error there was in the prosecutor's statements, they did not have a substantial and injurious effect on the jury's verdict -- even cumulatively.

Howard has not established entitlement to relief under any part of Ground Three of the petition.

**IV. Motion for Evidentiary Hearing**

Howard has filed a motion for an evidentiary hearing on the question of deficient performance with respect to the ineffective assistance of counsel claim in Ground One. (ECF No. 60). Because the court resolves Ground One on the basis of prejudice, it does

not reach the question of performance, and an evidentiary hearing is unnecessary. The motion for evidentiary hearing is therefore denied.

**V. Certificate of Appealability**

In order to proceed with an appeal, Howard must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, Howard has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.*

The court has considered the issues raised by Howard, with respect to whether they satisfy the standard for issuance of a certificate of appealability, and determines that none meet that standard. Accordingly, Howard will be denied a certificate of appealability.

## VI. Conclusion

In accordance with the foregoing, IT IS THEREFORE ORDERED that the amended petition for writ of habeas corpus (ECF No. 21) is DENIED, and this action is therefore DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Howard's motion for an evidentiary hearing (ECF No. 60) is DENIED.

IT IS FURTHER ORDERED that Howard is DENIED a certificate of appealability, for the reasons set forth above.

The Clerk of Court shall enter final judgment accordingly and CLOSE this case.

IT IS SO ORDERED.

DATED: This 12th day of February, 2020.

_____
UNITED STATES DISTRICT JUDGE